## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH THE

FACEBOOK USERNAMES

**Gian.pangilinan.79**

Case No. 3:19-mj-00446-MMS

HOSTED BY FACEBOOK INC.
1601 WILLOW ROAD,
CITY OF MENLO PARK
STATE OF CALIFORNIA

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I Ryan W. Borgeson, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

I make this affidavit in support of an application for a search warrant for information associated with a certain FACEBOOK username gian.pangilinan.79 that is stored at premises controlled by FACEBOOK INC., which owns and operates a free-access social networking website of the same name and headquartered at 1601 Willow Road, Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require FACEBOOK INC. to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

OCT 07 2019

Page **1** of **28**

1.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). Beginning in May 2018, I attended a 28-week ATF academy in Glynco, Georgia that certified me as an ATF Special Agent. I have been assigned to the Anchorage Field Office since December 2018. Since becoming a Special Agent with the ATF, I have participated in numerous federal, state and local investigations involving firearm traffickers, armed narcotic traffickers, felons in possession of firearms and ammunition and the use of firearms in furtherance of drug trafficking crimes and other crimes of violence. Many of which involved the use of cellular telephones and social media. Through my training and experience, I have participated in many investigations where cellular telephone and/or social media location revealed evidence of the crime involved. Through my training and experience, I have learned that individuals engaging in narcotics trafficking often use cellular phones and social media applications on their cellphone (such as Facebook) to communicate with each other in order to coordinate activities.

2.      Through instruction and participation in firearm and narcotic related investigations, and through my conversations with other law enforcement officers, with whom I work, I know that:

> a. The distribution of controlled substances is an activity that continues over months and years. Persons involved in the trafficking of illegal controlled substances typically will obtain and distribute controlled substances on a regular basis, much as a distributor of a legal commodity would purchase stock for sale. Similarly, such drug traffickers will maintain an "inventory" which will fluctuate in size depending upon the demand for and the

OCT 07 2019          Page **2** of **28**

available supply of the product. I have learned through the experience of other law enforcement officers, that drug traffickers keep records of their illegal activities not only during the period of their drug trafficking violations but also for a period of time extending beyond the time during which the trafficker actually possesses/controls illegal controlled substances. The records are kept in order to maintain contact with criminal associates for future transactions and so that the trafficker can have records of prior transactions for which the trafficker might still be owed money or might owe someone else money. I have learned through the experience of other law enforcement officers, drug traffickers often have records of customers, as well as evidence of suppliers and co-conspirators, in one or more cellular telephones, either in the contact lists, sent or received calls, text messages, or social media accounts (such as Facebook). These items are maintained in locations to which dealers of illegal controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

b. In *United States v. Terry*, F.2d 272 (9th Cir. 1990), *United States v. Angulo-Lopez*, 791 F.2d 1394,1399 (9th Cir.1986), *United States v. Hernandez-Escargega*, 886 F. 2d 1560, 1567 (9th Cir. 1989) and in *United States v. Fannin*, 817 F. 2d 1379, 1381-1382 (9th Cir. 1987), the court held that in

OCT 07 2019

Page **3** of **28**

the case of drug traffickers, evidence is likely to be found where dealers live and a search warrant may be properly issued against a suspected drug dealer's residence despite the lack of direct evidence of criminal activity at the residence. The court also held, in *United States v. Cardoza*, 769 F. 2d 625, 630 (9th Cir. 1985), that a search warrant may be properly issued to search a drug trafficker's storage locker despite lack of direct evidence linking the storage locker to criminal activity.

c.  Individuals involved in the use, possession, manufacture, and/or trafficking of controlled substances commonly take measures insulate/distances themselves from their illicit activities, as well as the instruments used therein, to include premises, vehicles, firearms, and telephones. These measures include the use of real or fictitious nominees for transactions and activities which require the presentation of identification. Examples of these measures include: the use of premises rented, owned, or maintained by others (to include the use of others in opening utility accounts); the use of cellular telephones held in another's name; the use of social media accounts in another's name; the use of others to ship and/or receive money and/or controlled substances; the use of others to purchase and/or store firearms, and the use of others to directly interact with the drug customers during the transactions. These measures also include the use of vehicles rented or owned by others, as well as the failure to transfer the title to newly purchased vehicles from the previous owner to the trafficker or even a nominee.

OCT 07 2019

d. It is common for members of drug trafficking organizations to utilize fraudulent identification, in order to purchase airline tickets, send wire transfers, rent residences and storage facilities and subscribe for telephone/cellular telephone service. I have learned through the experience of other law enforcement officers that it is common for drug traffickers to keep fraudulent identification nearby and easily accessible to facilitate their flight upon the discovery of their illegal activities by law enforcement. All of these items are maintained in locations to which dealers of illegal controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities; such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

e. It is common for members of drug trafficking organizations to possess scanners, security cameras and communications equipment (i.e. cellular telephones, fax machines and computers with Internet access) to protect and conceal their operation from law enforcement and other criminals and to monitor surveillance activities of law enforcement. Computer equipment is also used by members of drug trafficking organizations to store records related to drug trafficking and money laundering activities. All of these items are maintained in locations to which dealers of illegal controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members,

OCT 0 7 2019

Page **5** of **28**

friends and associates; the places in which they conduct their drug distribution activities; such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

f. It is common for members of drug trafficking organizations, in an attempt to disguise their identities and illegal activities, to use pre-paid cellular telephones and pre-paid long distance calling cards. I know that often times the only way to connect a subject with a particular pre-paid cellular telephone or calling card is to seize the phone or calling card from the trafficker or his residence. The aforementioned items are maintained in locations to which dealers of illegal controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities; such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

g. It is common for members of drug trafficking organizations to maintain telephonic/text message/messenger communications before, during and after drug transactions. Calls and/or text messages are often made between the drug source of supply and the drug recipient, prior to departure of a drug courier and upon arrival of a drug courier at the destination. Once at the destination, it is common for the courier to contact the recipient, via the telephone. Records of such contacts, whether

OCT 0 7 2019

Page **6** of **28**

call logs or text messages, are frequently maintained in the cellular telephone's memory, iCloud account, or Facebook account.

h. It is common for individuals involved in drug trafficking to use multiple cellular telephones to maintain contact with their associates. These individuals use multiple cellular telephones because cellular telephones are mobile and can be easily obtained with a different subscriber name, but could be linked to the same Facebook account. A different subscriber name and/or telephone number is often used by members of a drug trafficking organization to thwart law enforcement detection of their illicit drug trafficking activities. These different telephone numbers often have different subscriber names and/or are pre-paid cellular telephones where the subscriber is difficult to determine. Due to the fact that several different telephone numbers may be used, it is common for traffickers of controlled substances to maintain the names and telephone numbers of associates within the cellular telephone memory. These associate names and telephone numbers may be stored in historical call logs, text messaging history or within the contacts section of the cellular telephone or could be stored in their Facebook/Facebook messenger account.

i. It is common for members of drug trafficking organizations to take or cause to be taken, photographs and/or videos of themselves and their co-conspirators and associates. It is also common for members of drug trafficking organizations to take or cause to be taken, photographs and/or videos of themselves and/or their co-conspirators with controlled

OCT 0 7 2019

Page **7** of **28**

substances, large sums of money, guns and expensive assets (i.e. jewelry, luxury cars). The aforementioned images are frequently maintained on the Facebook account.

j.   Certain cellular telephones have a feature which allow the subscriber or user of the device remote access to "wipe" or delete all the information if the device no longer in their possession whether it be because it is lost, stolen, or seized.

3.   Further, through instruction, training, and participation in investigations, as well as through consultation with other agents and law enforcement personnel, I have become familiar with the manner in which armed narcotics traffickers conduct their illegal business and the methods used to disguise their narcotics activities. From experience and training, I have also learned that narcotics traffickers frequently use encrypted cellular telephone applications, cellular phone services, and social media to communicate, conduct, and conceal their illegal activities from law enforcement.

4.   Based on the facts as set forth in this affidavit, there is probable cause to believe that the information described in Attachment A contains evidence of violations of Title 21 U.S.C. §841(a)(1) possession of a controlled substance with intent to distribute and 18 U.S.C. §924(c) possessing a firearm in furtherance of drug trafficking, as described in Attachment A for evidence and instrumentalities of these crimes as further described in Attachment B. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

OCT 0 7 2019

Page **8** of **28**

## **PROBABLE CAUSE**

### **APD Case 18-10269**

#### *March 11, 2018, Misconduct Involving Controlled Substance (MICS)*

5.    March 11, 2018, Anchorage Police Department (APD) Officer Degnan was dispatched to a disturbance at 7558 Foxridge Way #6F, Anchorage, AK 99518. PANGILINAN was arrested on Municipal Conditions. During the search Officer Degnan found a small clear baggie with 1.15 grams of a white crystal substance in PANGILINAN's pocket. The substance field-tested positive for methamphetamine. PANGILINAN stated during a post-Miranda interview that the substance was methamphetamine and that he recently started using again.

### **APD Case 18-51612 and 18-51793**

#### *December 26, 2018, Eluding and MICS*

6.    December 26, 2018, APD was pursuing a lead of a tracked stolen Subaru Outback bearing AK Plate: JKN560. The vehicle was located at 8101 Peck, Anchorage, Alaska, still running, and the driver sleeping in the driver seat, as the sole occupant. APD removed the driver (identified as PANGILINAN) from the vehicle without incident. Officer Rydberg observed two cell phones (**APD Tags: 1177969** and **1177970**) in the vehicle, one of which was receiving a text message.

OCT 0 7 2019

7. According to Officer Rydberg, the message displayed on the phone was consistent with an illicit drug customer requesting $250 worth of an illicit substance from their drug supplier. Officer Rydberg based this opinion on his training and experience, as well as his tenure with APD's Vice Unit. PANGILINAN was searched and a small baggy with a white crystalline substance was removed from his left jacket pocket. The crystalline substance weighed 1.01 grams and field-tested positive for methamphetamine.

## APD Case 19-5404

### *February 10, 2019, Misconduct Involving Controlled Substance (MICS)*

8. February 10, 2019, APD Officer See conducted a traffic stop on a vehicle whose occupant(s) gave information to Officer See. Officer See was informed that PANGILINAN had multiple warrants and was dealing narcotics. PANGILINAN was currently supplying "Isaac" who works security at Barrett Inn Hotel (Address: 4610 Spenard Rd, Anchorage, AK 99517).

## APD Case 19-7231

### *February 24, 2019, MICS, Assault, Eluding, Resisting Arrest, Tampering with evidence*

9. February 24, 2019, APD responded to a shots fired call at the Mt. View Car Wash (Address: 3433 Commercial Dr, Anchorage, Alaska). When officers arrived a green/black Honda Civic bearing AK Plate: JKX415 was attempting to flee the location. Officer Frey attempted to block the Civic which resulted in the Civic ramming the patrol car. The driver of the vehicle (identified as PANGLILNAN) fled the vehicle along with

OCT 07 2019

passengers Hans WELLS and Shania AGLI. A pistol was observed on the driver's seat of the vehicle with an extended magazine.

10. PANGILINAN pulled an iPhone (**APD Tag: 1181490**) and other items out of his pockets, dropping them on the ground. PANGILINAN continued to refuse commands and was ultimately tased to gain compliance. Officers located a baggy containing .81 grams of a white crystal substance that tested positive for methamphetamine near the iPhone, where PANGILINAN was dropping items on the ground.

11. During a post-Miranda interview, AGLI stated that she received a phone call from PANGILINAN where she heard gunshots in the background. AGLI arrived at the Mt. View Car Wash and observed PANGILINAN upset and he shot a round into the center console of the vehicle. While speaking with PANGILINAN, AGLI heard sirens in the distance. PANGILINAN then attempted to take another vehicle, trying to flee the scene.

## APD Case 19-19061

### *May 31, 2019, Assault on Peace Officer*

12. May 31, 2019, APD Officer Richwine performed a traffic stop on a black GMC Yukon/Denali bearing AK Plate: EAA659 at the 227 block of Newell Street, Anchorage, AK. As Officer Richwine contacted the driver of the vehicle, Officer Richwine observed spent cartridge cases on the front and rear passenger floorboards, numerous loose pieces of ammunition throughout the vehicle, along with a loaded Glock 21 pistol with an extended magazine tucked behind the driver seat near the center console. Officer Richwine secured the Glock 21 pistol and began asking the driver and passenger questions. The driver of the vehicle was identified as PANGILINAN.

13. While Officer Richwine began to research PANGILINAN through his mobile computer in his patrol vehicle, a white Kia sedan or white Ford Fusion with tinted windows drove by the traffic stop, shooting. Officer Richwine began to exit his vehicle, and as he was doing so, the GMC Yukon/Denali bearing AK Plate: EAA659 began to drive in reverse toward Officer Richwine's patrol car. The GMC Yukon/Denali rammed the patrol car and the open driver door struck Officer Richwine in the chest, knocking him off his feet, and causing him pain. The GMC Yukon/Denali pulled forward and backed into the patrol car again to gain space, attempting to flee. The GMC Yukon/Denali eluded police, driving through fences and yards. The GMC Yukon/Denali and white Kia/Ford Fusion successfully elude apprehension.

## APD Case 19-19615

### *June 4, 2019, Threat*

14. June, 4, 2019, APD Officer Timothy Masten was investigating a drive by shooting threat at 1037 Fred Circle, Anchorage, AK 99515. Officer Masten interviewed the neighbors of 1037 Fred Circle who confirmed that two previous shooting occurred at 1037 Fred Circle on June 3, 2019 and June 4, 2019 (APD Reports 19-19404 and 19-19552). Officer Masten interviewed the occupant/victim of 1037 Fred Circle who stated that she received a text message from her husband naming PANGILINAN as one of the four suspects of the reported shootings.

15. Officer Masten contacted the Anchorage Pretrial Office and was informed that PANGILINAN was a methamphetamine dealer. PANGILINAN had cut off his ankle monitor on May 20, 2019 and pretrial retrieved the property on May 21, 2019 and found a

OCT 0 7 2019

Page **12** of **28**

meth pipe along with an empty holster were located at PANGILINAN's residence 327 Pauline St #B, Anchorage, AK 99504.

#### APD Case 19-19902

##### *June 6, 2019, Eluding, MIW/Driveby Shooting*

16.     June 6, 2019, APD was actively looking for a 2001 black GMC Yukon/Denali bearing AK Plate: EAA659 for being in multiple crimes. The GMC Yukon/Denali was located at 3021 Lois Drive, Anchorage, Alaska unoccupied. A gold GMC Sierra bearing AK Plate: JDA631 dropped off a Polynesian male who got into the driver's seat of the black GMC Yukon/Denali. Officer Lewis attempted to stop the GMC Yukon/Denali. The driver failed to stop and Officer Lewis unsuccessfully attempted to pin the GMC Yukon/Denali. An occupant of the gold GMC Sierra began firing multiple rounds while Officer Lewis attempted to stop the GMC Yukon/Denali.

17.     The GMC Yukon/Denali was located near 833 N Bunn, Anchorage, Alaska, and the GMC Sierra was located at 3324 Thompson, Anchorage, Alaska, both vehicles unoccupied. The vehicles were seized pending search warrant and taken to APD Indoor Secured Storage.

18.     June 11, 2019, APD applied for and was granted search warrants 19-1898SW (gold GMC Sierra bearing AK Plate: JDA631) and 19-1900SW (black GMC Yukon/Denali bearing AK Plate: EAA659).

19.     June 12, 2019, APD served search warrants 19-1898SW and 19-1900SW. Fingerprints and DNA were taken from both vehicles. June 18, 2019, the fingerprint

OCT 0 7 2019

specimen from the gold GMC Sierra's driver's exterior door was positively identified as belonging to PANGILINAN.

20. During the course of this investigation, I have learned that PANGILINAN and his co-conspirators travel in tandem vehicles. If one of the vehicles is stopped by law enforcement, the other vehicle will provide a distraction, such as shooting in the officer's direction, so the other vehicle can elude law enforcement.

## APD Case 19-24229

### *July 9, 2019, MICS and Eluding*

21. On July 9, 2019, APD conducted surveillance at 327 Pauline, Anchorage, Alaska for an active State of Alaska arrest warrant for PANGILINAN. PANGILINAN left 327 Pauline and got into the right rear passenger seat of a red Suburban bearing AK Plate: EEJ941. The driver of the vehicle was observed and identified as Hans WELLS. WELLS also had outstanding warrants for his arrest. APD followed the red suburban to the Holiday Gas Station at 1405 Bragaw, Anchorage, Alaska where they attempted to stop the vehicle. The Suburban eluded.

22. APD officers located the red Suburban, abandoned, in an empty parking lot at the intersection of Fireweed Lane and Seward Highway, Anchorage, Alaska. APD officers observed PANGILINAN enter 606 E Fireweed Lane, Anchorage, Alaska at approximately 1745 hours, via Sorrento's Restaurant (Address: 610 E Fireweed Lane, Anchorage, Alaska) surveillance camera footage. At approximately 1901 hours,

OCT 0 7 2019

PANGILINAN departed 606 E Fireweed Lane and got into an unknown white Chevrolet Tahoe.

23. At approximately 2215 hours, PANGILINAN was observed leaving 3240 Penland Parkway #88, Anchorage, Alaska in the front passenger seat of a red Honda CRV, bearing AK Plate: JMM930. APD officers observed WELLS leave 3240 Penland Parkway #88 and walk east towards Burger King (Address: 700 Northway Dr, Anchorage, Alaska). Officers observe WELLS approach a 2014 white Cadillac Escalade (AK Temporary Tag: T816535) where PANGILINAN was standing near the driver's side door.

24. At approximately 2225 hours, APD officers approached the vehicle to arrest PANGILINAN. PANGILINAN attempted to flee the area. APD Officer Jonathan Butler observed PANGILINAN discard items as he fled the area. PANGILINAN climbed a fence on the west side of the Burger King parking lot and continued to discard items, to include a white iPhone with a Under Armour case and sim card (**APD Property Tag: 1198846**). APD officers eventually contacted PANGILIAN and he was arrested for his outstanding State of Alaska arrest warrant.

25. Through his prior training and experience, APD Officer Butler identified some of the discarded items as suspected methamphetamine. APD Officer Sean Keating collected and took custody of the suspected methamphetamine and the white iPhone. The substance field-tested positive for methamphetamine. The methamphetamine was weighed at APD and had a gross weight of 166 grams (including packaging). Additionally, officers observed and captured a photo of the locked screen of the white iPhone in which there were several missed calls and Facebook messages from known associates of PANGILINAN.

OCT 07 2019

Page **15** of **28**



26.     APD applied for and was granted search warrant 3AN-19-2225SW for the detached storage shed in the back yard of 327 Pauline #B, which PANGILINAN had sole access to. Officers observed a sophisticated security system within the shed which covered all avenues of approach along with a safe, firearm magazines, ammunition, a digital scale, and other items. The following items were seized from the shed:

a.  **APD Tag: 1198643**-Swann DVR

b.  **APD Tag: 1198644**-Samsung DVR

c.  **APD Tag: 1198645**-Night Owl DVR



OCT 07 2019

Page **16** of **28**

d. **APD Tag: 1198647**-Digital scale

e. **APD Tag: 1199219**-Safe

27.     APD Officer Butler breached the safe and seized the following content within the safe:

a. **APD Tag: 1198641**-Drug scale from safe, with drug residue

b. **APD Tag: 1198642**-Two Thumb Drives from safe

28.     On July 10, 2019 (the day after PANGILIAN was arrested after fleeing officers), ATF Task Force Officer (TFO) Adair contacted occupants at 3240 Penland #88, Anchorage, AK where PANGILIAN was observed the previous day. Veronica ZITTNAN was arrested for outstanding warrants after she attempted to flee the residence. ATF TFO Adair spoke with occupants of the residence, who stated PANGILIAN discarded multiple firearms at the home after initially fleeing officers on the 9th. ATF TFO Adair suspected evidence of this information might be contained within the cellular telephone PANGILIAN attempted to discard before being arrested.

#### ATF Case 787010-19-0069

##### *Continued investigation*

29.     Based upon my training and experience, the amount of methamphetamine possessed by PANGILIAN on July 9, 2019 is consistent with the intent to distribute. Although no firearms were located on his person at the time of arrest, it is common for individuals engaged in mid-level drug transactions to possess firearms to protect themselves and their business endeavor. This common possession of firearms is also apparent in the aforementioned cases. I suspect evidence of his involvement with firearms,

OCT 07 2019                                 Page **17** of **28**

in relation to the distribution of controlled substances, will also be located within the team_g907@icloud.com iCloud account sought in this affidavit.

30. August 7, 2019, at approximately 1330 hours, APD Cyber Crimes Technician Brandon Hunter executed search warrant 3:19-mj-291-DMS for PANGILINAN's phone (**APD Tag: 1198846**). The security encryption could not be bypassed. From the partial extraction, ATF SA Ryan Borgeson was able to locate an iCloud account linked to the phone: team_g907@icloud.com.

31. On October 2, 2019, ATF SA Borgeson reviewed jail phone calls made by PANGILINAN, July 10, 2019 through August 1, 2019 and September , while incarcerated in Anchorage Jail (Address: 1400 E 4th Ave, Anchorage, Alaska). A review of these jail calls identified the following pertinent conversations made from PANGILINAN's account:

### *July 22, 2019 at 1632 Hours - Phone call to phone number 907-957-0944*

32. At approximately 4 minutes and 55 seconds Shania asks PANGILINAN "Why you keep telling me you fucked over my cousin Mathew nigga?" "Why do you keep telling me you got my cousin for 800?". PANGILINAN replies with "cause he didn't send my fucking last bill, he owe me like 1800 the last trip".

33. At approximately 8 minutes Shania states "I know I should have got you for that ah eight (8) grand last time" "the eight, eight, eight racks last time". PANGILINAN responds with "oh oh ya in the bag?". Shania responds with "eight grand in fifteen minutes nigga".



OCT 07 2019

Case 3:19-mj-00446-MMS Document 1-1 Filed 10/07/19 Page 18 of 28

34.     At approximately 10 minutes and 10 seconds PANGILINAN states "he admitted to Anchorage Police that he drives me around town to sell drugs" "I don't know but, I forgive him".

35.     At approximately 14 minutes Shania asks PANGILINAN if he ever found anything out about his Kia. Shania wonders if APD still has it and what is going on with it, referencing that something of significance was located in the vehicle.

36.     During the course of the investigation, I have learned that PANGILINAN and his co-conspirators have engaged in numerous crimes involving firearms and controlled substances. I suspect evidence of his involvement with firearms, in relation to the distribution of controlled substances, will be located within the Kia.

### *July 23, 2019 at 2013 Hours - Phone call to phone number 907-957-0944*

37.     At approximately 4 minutes into the conversation, PANGILINAN states "Tell Mika I'm over here ah, I'm on Golf Mod" "the side of the jail where the trailer is where he could just pishhh pishhh pishhh" If they know where I am at technically they could get me out of here" "cause the gate is right there, and its only grass" "only fucking a wall." "I think one Hummer." "I'm going to make a plan and send it to you".

### *July 31, 2019 at 1651 Hours – Phone call to phone number 907-312-0386*

38.     At approximately 1 minute and 10 seconds into the conversation PANGILINAN states "I left something in there… the cabinet where the dart board is" "there's a gat there… my gun, just look you'll see it".

OCT 07 2019

Page **19** of **28**

*September 26, 2019 at 2031 Hours – Phone call to phone number 907-744-8071*

39.    At approximately 15 minutes and 30 seconds PANGILINAN states "I'm going to do my time, I'm going to finish it… then I'm back at it again."

40.    Furthermore, these individuals communicate and plan their criminal activities through Facebook Messenger.

41.    As such, there is probable cause that gian.pangilinan.79's Facebook Accounts will contain evidence of criminal activity, including title 21 U.S.C. §841(a)(1) possession of a controlled substance with intent to distribute and 18 U.S.C. §924(c) possessing a firearm in furtherance of drug trafficking.

42.    In my training and experience, I have learned that FACEBOOK is a company that collects significant data from its users. I also know that social media platforms, such as FACEBOOK, have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service. Past investigations have shown FACEBOOK to produce geographic latitude and longitude and GPS coordinates of the device on which the FACEBOOK application is downloaded and logged in.

43.    Based on my training and experience, I know that FACEBOOK typically collects and retains location data pertaining to the devices onto which the FACEBOOK account is logged in to which they provide service in their normal course of business in order to use this information for various business-related purposes. A preservation request for the accounts of the above-cited usernames and user ID has been sent to FACEBOOK.

44.    Based on my training and experience, I know that FACEBOOK typically collects and retains information about their users in their normal course of business. This

OCT 07 2019

information can include basic personal information about the user, such as name and address, and the method(s) of payment (such as credit card account number) provided by the user, cellular telephone numbers, and related accounts. I also know that FACEBOOK typically collects and retains information about their users' use of the FACEBOOK application, such as records about posts and other direct messaging communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the accounts user or users and may assist in the identification of co-conspirators and/or victims.

45. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

46. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written

OCT 07 2019

Page **21** of **28**

news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

47. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

48. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

49. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook

OCT 07 2019

Page **22** of **28**

friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

50. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

51. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

OCT 07 2019

Page **23** of **28**

52.    Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

53.    If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

54.    Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

55. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

56. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The


OCT 07 2019

activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

57. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

58. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

59. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

60. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

61. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future

OCT 07 2019

and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

62. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

63. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

64. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications,

and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

OCT 0 7 2019

Page **27** of **28**

65. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## **AUTHORIZATION REQUEST**

66. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

67. I further request that the Court direct FACEBOOK to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control within seven (7) days. Because the warrant will be served on FACEBOOK, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

Special Agent
ATF

Subscribed and sworn to before me on this 7th day of October, 2019.

UNITED STATES MAGISTRATE JUDGE

**MATTHEW M. SCOBLE**
U.S. Magistrate Judge

